## Case No. 14,884.

### UNITED STATES v. CRANDELL.

[2 Cranch, C. C. 373.] 1

Circuit Court, District of Columbia. April Term, 1823.

WITNESS—INTEREST—INDICTMENT FOR FORGERY.

The person intended to be injured by a forgery, and the person whose name is forged to a certifi-

cate, are competent witnesses to prove the forgery. But, if the witness has paid money upon the forged paper, he is not competent to prove the forgery.

There were three indictments against the defendant [William Crandell] for forgery. In one he was charged with forging a certificate purporting to be signed by one Henry Naylor with intent to defraud one Holmead.

Mr. Key, for defendant, objected to Naylor and Holmead as witnesses for the prosecution.

## Case No. 14,885.

### UNITED STATES v. CRANDELL.

[4 Cranch, C. C. 683.] 1

Circuit Court, District of Columbia. March Term, 1836.

SEDITIOUS LIBEL—INTENT—PUBLICATION—WITNESS —MULATTO.

1. Upon an indictment for a seditious libel, it is not competent for the United States, for the purpose of proving the intent of the defendant in publishing the libel charged in the indictment. to give in evidence any papers subsequently published by the defendant, or found in his possession, unpublished by him, which would be libels, and might be substantive subjects of public prosecution, if published.

2. After having given evidence tending to prove a publication of the libel here, evidence may be given that other copies of the same libel were found in the possession of the defendant, with certain other papers or pamphlets, but not of the contents of such other papers or pamphlets, unless they have relation to the libels charged in the indictment, and would not, in themselves, be substantive ground of prosecution.

3. Publication of pamphlets in New York is not evidence of their publication here, in Washington county. so as to fix upon the defendant here such a knowledge of their publication as to make his possession, alone, of other copies of the same, even with the words "read and circulate" written upon them, evidence of the publication of them. by him, here.

4. The United States cannot, in order to show the evil intent with which the defendant published the paper, give, in evidence. other unpublished papers or pamphlets, found in the defendant's possession. unless accompanied by evidence of some acknowledgment or admission, by the defendant, that he knew and approved their contents.

5. Upon the trial. on the plea of not guilty, the court will not prevent the United States from giving evidence in support of a count which

might be deemed insufficient, upon a motion in arrest of judgment.

6. The fact that certain papers were found in the possession of the defendant, may be given in evidence, although the papers may have been seized under an illegal warrant.

7. In a prosecution for a libel, the United States may give evidence to the jury that the defendant was found in possession of printed copies of the libel charged in the indictment, if some evidence has been given of the publication of the same libel, in this district.

8. Upon a count for publishing certain libellous pictures, the court will not suffer the pamphlets to which they were attached to be read, in evidence, to the jury, to show the evil intent with which the defendant published the pictures, nothing but the pictures being charged as a libel in that count.

9. The counsel for the prosecution, in opening the argument, may read to the jury any part of the pamphlet given in evidence by the United States, which is pertinent to the issue, although not read in the opening of the evidence.

10. A mulatto, born of a white woman, is a competent witness against a Christian white person.

This was an indictment [against Reuben Crandell], for publishing libels tending to excite sedition among the slaves and free colored persons in this district. It contained five counts.

1st. The first charged the defendant with publishing a libel containing, in one part thereof, these words: "Then we are not to meddle with the subject of slavery in any manner; neither by appeals to patriotism, by exhortations to humanity, by application of the truth to the conscience. Nor, even to propose, in congress, that the seat of our republican government may be purified from this crying abomination, under penalty of a dissolution of the Union." And in another part thereof, in an article entitled, "Reply to Mr. Gurley's Letter, Addressed to the Reverend R. R. Gurley, Secretary of the American Colonization Society, Washington City," signed by Arthur Tappan and others, the following words: "We will not insult your understanding, sir, with any labored attempt to prove to you that the descendants of African parents, born in this country, have as good a claim to a residence in it as the descendants of English, German, Danish, Scotch, or Irish parents. You will not attempt to prove that every native colored person you meet in the streets has not the same right to remain in this, his native land, that you and we have. Assuming this as an incontrovertible truth, we hold it self-evident that they have as good right to deport us to Europe, under pretext that there we shall be prosperous and happy, as we have to deport them to Africa, on a similar plea." And in another part thereof, in the said reply, the following words: "In what language could the unrighteous principles of denying freedom to colored people, in this country, (which amounts to the same thing as demanding the expulsion of those already free,) be more effectually, and yet more plausibly, inculcated, than in those very words of General Harper, you have, with so much approbation, quoted to us." And in another part thereof, in the said reply, the following words: "Against this doctrine of suspending emancipation, upon the contingency or condition of expatriation, we feel bound to protest; because we believe that every man has a right to reside in his native country, if he chooses, and that every man's native country is the country in which he was born; that no man's right to freedom is suspended upon, or taken away by, his desire to remain in his native country; that to make a removal from one's own native country, a sine qua non of setting him free, when held in involuntary bondage, is the climax of moral absurdity." And in another part thereof, in another article entitled, "Three Months' Residence, or Seven Weeks on a Sugar Plantation, by Henry Whitby," containing the most disgusting and shocking details of cruel, inhuman, and immoral treatment of slaves, by the owners and overseers, and attorneys, or agents of proprietors, according to the tenor and effect following, that is to say: "On this and other occasions, I thought it my duty to acquaint the attorney with my observations and feelings in regard to the cruel floggings and severe treatment, generally, which I have witnessed at New Ground. He admitted the facts, but said that plantation work could not be carried on without the cart-whip. He moreover labored hard to convince me that the flogging did not injure the health of the negroes. I also told him of the exceeding immorality and licentiousness which I had witnessed, mentioning, in substance, the facts previously detailed. He replied that that was a thing which they must wink at." "If a man, in manner, so much the gentleman, and in other respects, so estimable, was necessarily led to countenance or wink at the enormities I have feebly attempted to describe, what, I ask, is to be expected from its subordinate administrators, who are continually exposed to the demoralizing influences of slavery? What, indeed, but the frightful wickedness and cruelty which are its actual fruits?" "In contempt of the laws, to the disturbance of the public peace, to the evil example of all others, and against the peace and government of the United States."

2d. The second count charges the publication of another libel, containing, among other things, the following words, namely: "Our plan of emancipation is simply this: To promulgate the doctrine of human rights in high places and low places, and in all places where there are human beings; to whisper it in chimney-corners, and to proclaim it from the house-tops, yea, from the mountain-tops; to pour it out, like water, from the pulpit and the press; to raise it up with all the force of the inner man, from infancy to gray hairs; to give line upon line, precept upon precept, till it forms one of the foundation principles and parts indestructible, of the public soul." And in another part thereof, the following, namely: "I (meaning the said

Crandell,) am not unaware that my remarks may be regarded. by many, as dangerous and exceptionable; that I may be regarded as a fanatic for quoting the language of eternal truth; and denounced as an incendiary for maintaining, in the spirit as well as the letter, the doctrines of American Independence. But if such are the consequences of a simple performance of duty, I shall not regard them. If my feeble appeal but reaches the hearts of any who are now slumbering in iniquity; if it shall have power given to it to shake down one stone from that foul temple where the blood of human victims is offered to the Moloch of slavery; if, under Providence, it can break one fetter from off the image of God, and enable one suffering African

' To feel
The weight of human misery less, and glide
Ungroaning to the tomb,'

I shall not have written in vain; my conscience will be satisfied. Far be it from me to cast new bitters into the gall and wormwood waters of sectional prejudice. No, I desire peace; the peace of universal love; of catholic sympathy; the peace of common interest; a common feeling, a common humanity. But so long as slavery is tolerated, no such peace can exist. Liberty and slavery cannot dwell in harmony together. There will be a perpetual war in the members of the political Mezentius; between the living and the dead. God and man have placed between them an everlasting barrier, an eternal separation. No matter under what law or compact their union is attempted. the ordination of Providence has forbidden it, and it cannot stand. Peace! There can be no peace between justice and oppression; between robbery and righteousness, truth and falsehood, freedom and slavery. The slaveholding states are not free. The name of liberty is there, but the spirit is wanting. They do not partake of its invaluable blessings. Wherever slavery exists to any considerable extent, with the exception of some recently-settled portions of the country, and which have not yet felt, in a great degree, the baneful and deteriorating influences of slave labor, we hear, at this moment, the cry of suffering. We are told of grass-grown streets; of crumbling mansions; of beggared planters, and barren plantations; of fear from without, of terror within. The once fertile fields are wasted and tenantless, for the curse of slavery, the improvidence of that laborer whose hire has been kept back by fraud. has been there. poisoning the very earth beyond the reviving influence of the early and the latter rain. A moral mildew mingles with and blasts the economy of nature. It is as if the finger of the everlasting God had written upon the soil of the slaveholder, the language of his displeasure. Let, then, the slaveholding states consult their present interest, by beginning, without delay, the work of emancipation. If they fear not. and mock at,

the fiery indignation of Him to whom vengeance belongeth, let temporal interests persuade them. They know, they must know, that the present state of things cannot continue. Mind is the same everywhere, no matter what may be the complexion of the frame which it animates. There is a love of liberty which the scourge cannot eradicate: a hatred of oppression which centuries of degradation cannot extinguish. The slave will become conscious, sooner or later, of his strength; his physical superiority; and will exert it. His torch will be at the threshold, and his knife at the throat of the planter. Horrible and indiscriminate will be the vengeance. Where, then, will be the pride, the beauty, and the chivalry of the South? The smoke of her torment will rise upward, like a thick cloud, visible over the whole earth."

3d. The third count charged the defendant with publishing twelve other libels, in which were represented and exhibited "several disgusting prints and pictures of white men in the act of inflicting, with whips, cruel and inhuman beatings and stripes upon young and helpless and unresisting black children; and inflicting with other instruments, cruel and inhuman violence upon slaves, and in a manner not fit and proper to be seen and represented; calculated and intended to excite the good people of the United States, in said county, to violence against the holders of slaves in said county as aforesaid; and calculated and intended to excite the said slaves, in the said county, to violence and rebellion against their said masters, in said county, in contempt of the laws, to the disturbance of the public peace. to the evil example of all others, and against the peace and government of the United States."

No evidence having been offered upon the fourth and fifth counts, they are omitted.

All these counts contained averments that, at the time of the publication of these libels, the citizens of the United States, residing in the county of Washington, in the District of Columbia, were lawfully authorized to hold slaves as property, and that many of them did so hold them; and that many free persons of color, also, reside in the district; and that the defendant unlawfully, maliciously, and seditiously contriving and intending to traduce, vilify, and bring into hatred and contempt, among the citizens of the United States. the laws and government of the United States, in the county of Washington, as duly established and in force, and to inflame and excite the people of the United States to resist, and oppose, and disregard the laws and government aforesaid, and the rights of proprietors of slaves in the said county, and to inflame and excite to violence against the said proprietors of the said slaves, not only the ignorant and ill-disposed among the free people of the United States, and the free persons of color in the said county, but also the slaves; and to produce among the said slaves and free persons of color, insubordina-

tion, violence, and rebellion, and to stir up war and insurrection between the said slaves and their said masters, published the said libels, containing, among other things, divers false, malicious, and seditious matters of and concerning the laws and government of the United States in the said district, and of and concerning the citizens of the United States holding slaves in the said district, and of and concerning the said slaves and free persons of color, and their labor, services, and treatment, and the state of slavery in the said district. The defendant pleaded not guilty.

Upon the trial, prima facie evidence of the publication by the defendant having been given, THE COURT permitted the pamphlet to be read to the jury, or as much thereof as either party might think proper to be read, and pertinent to the issue.

The district-attorney, Mr. Key, in order to show the evil intent with which the defendant published the libel charged in the first count, offered to prove that the defendant had in his possession other libels of the same tendency.

Mr. Bradley and R. S. Coxe, for the defendant, objected, and cited 1 Russ. 242, and Finnerty v. Tipper, 2 Camp. 72.

Mr. Key, contra, cited Rex v. Amphlit, 4 Barn. & C. 35.

THE COURT was of opinion that the United States could not, for the purpose of proving the intent of the defendant in publishing the libel stated in the first count, give in evidence to the jury any papers subsequently published by the defendant, or found in his possession unpublished by him, which would be libels, and might be substantive subjects of public prosecution, if published.

Mr. Key then offered to prove the publication, by the defendant, of the libels stated in the first, second, and third counts, by proving the following facts, namely: That a large collection of libels, and among them several copies of those charged in those counts, with the words, "read and circulate" written thereon in his handwriting, were found upon the traverser; that he undertook to account for their being in his possession, and gave untrue and contradictory accounts; that he acknowledged that he had brought here those then shown to him, being the same now in court, and that they comprehended all he brought here except about a dozen; and that prior to the traverser's arrest sundry similar publications had been privately sent to various persons in this district by some unknown person or persons in the district. 1 Hawk. P. C. c. 73, § 13. "The having in one's custody a written copy of a libel, publicly known, is an evidence of the publication of it." Rex v. Beare, 1 Ld. Raym. 414; 3 Chit. Cr. Law, 871, 875; 1 Chit. Cr. Law, 568; Maloney v. Bartley, 3 Camp. 210; 1 Russ. 235.

The counsel for defendant objected, and cited Holt, Libel, 291; Rex v. Burdett, 4 Barn. & Ald. 95; Starkie, Ev. pt. 4, pp. 849,

853; 1 Vent. 31; Smith v. Wood, 3 Camp. 323; 12 Vin. Abr. 227, "Evidence," T, 661; Rex v. Fitton, 2 Keb. 502.

THE COURT was of opinion that the attorney of the United States may give evidence of the publication, in this district, of any copies of the libels charged in the first and second counts of the indictment. That if he shall have given any evidence tending to show such a publication here, he will be permitted to show that other copies of the same libels were found in the possession of the defendant. He may then give evidence that a certain number of papers or pamphlets were found in the possession of the defendant, together with the copies of the libels charged, and of the publication of which, in this district, he shall have given evidence; but he will not be permitted to give in evidence to the jury the contents of any of the papers other than those charged as libels in this indictment, unless such other papers have relation to the libels charged in the indictment, and would not, in themselves, be substantive ground of prosecution. He may then give evidence to the jury of any confessions or acknowledgments made by the defendant in relation to any of the matters charged in the indictment. Starkie, Sland. & L. 351, 352, and Wyatt v. Gore, Holt, N. P. 299.

The attorney for the United States, having offered evidence to prove that the defendant was asked if he was aware of the nature of the pamphlets put into his hands in New York, and said he supposed they were of the same nature as those he had been a subscriber for, and that he approved the sentiments they contained, offered in evidence to the jury the publications found on the defendant relating to the same subject with the libels charged in the indictment; and contended that they were competent to be given to the jury with evidence that some of them were indorsed in the defendant's handwriting with the words, "read and circulate," to prove, not only the evil intent of the defendant in publishing the libellous paper charged in the first count, but as evidence of the publication, by the defendant, of the paper charged as a libel in the second count. He contended also that the pamphlets themselves purporting, upon their title page, to be printed and published in New York, are evidence of their own publication, and that it is only necessary to prove a copy to have been found in the defendant's possession, with the words, "read and circulate" indorsed thereon by the defendant to charge him with the publication of them here.

THE COURT was of opinion that the printing and publishing of these pamphlets, in New York, is not evidence of their publication here, so as to fix upon the defendant here such a knowledge of their publication as to make his possession alone, even with the words "read and circulate" written upon them, evidence of the publication of them,

by him, here. That, in order to show the evil intent with which the defendant published the paper charged in the first count, it is not competent for the United States to give, in evidence to the jury, other unpublished papers or pamphlets, found in the defendant's possession, unless accompanied by evidence of some acknowledgment or admission by the defendant that he knew and approved their contents. That the evidence did not appear to the court to justify the inference that the defendant knew and approved the contents of those pamphlets, unless it can be connected with evidence that they were of the same nature with those which he had been a subscriber for.

The attorney for the United States then gave evidence tending to show that the defendant had been a subscriber for the "Emancipator;" and the court permitted the attorney of the United States to give in evidence several numbers of that paper, as containing the sentiments alluded to by the defendant, as those which he approved, to show the evil intent with which he published the libel charged in the first count; but confined him to the reading of the sentiments contained in the "Emancipator" itself; and refused to permit him to read to the jury the publications advertised for sale by the secretary of the Anti-Slavery Society, in the Emancipator, although evidence had been given tending to prove that the defendant was a member of that society.

The attorney of the United States then being about to offer evidence in support of the third count; the counsel of the defendant objected that the count was so vague, uncertain, and imperfect, that the court ought not to permit evidence to be given in support of it; and the counsel on both sides agreed that the court should now consider the question as if upon a motion to quash that count.

Mr. Key, for the United States, and in support of the indictment, cited the precedents in 2 Chit. 45, 47, and 48.

The defendant's counsel cited 3 Chit. 901, 903, 904; 1 Russ. 210.

THE COURT (MORSELL, Circuit Judge, contra) permitted evidence to be given upon the third count, without prejudice to a motion in arrest of judgment upon that count, if the verdict should be against the defendant.

On the part of the defendant, it was then urged that the papers, found upon the defendant, had been illegally seized under pretence of an unlawful warrant commanding the officer, to whom it was directed, to arrest the defendant, and to search for and seize any incendiary pamphlets or papers which should be found in the defendant's possession, and bring them, with the defendant, before the justices who issued the warrant, and that therefore the pamphlets and papers so found are not admissible in evidence to the jury. Upon that point the defendant's counsel cited

Entick v. Carrington, 2 Wils. 275, 282, 291; State Trials, 1052, 1063; Lord Chief Justice Lee's Opinion; and St. 7 & 8 Geo. IV. c. 29, § 63.

Mr. Key, for the United States, contended, that if the warrant was illegal, (which he did not admit,) yet the fact that the libels were found upon him, may be given in evidence, in the same manner as you may, upon an indictment for counterfeiting coin, prove that the defendant was found in possession of the instruments and implements of coining; or upon an indictment for burglary, give evidence of false keys, &c.

THE COURT was of opinion that the seizure of the papers, even if illegal, cannot prevent the United States from giving, in evidence, the fact that the defendant had in his possession some of the libels charged in the indictment, and of the publication of which, in this district, evidence shall have been given.

The attorney for the United States having offered evidence tending to show that the libel charged in the second count, and one of those charged in the third count, had been published in this county, offered to prove that printed copies of the same were found in the possession of the defendant, at the time of his arrest, with the words "read and circulate." written by the defendant, upon some of them.

The counsel for the defendant, contended, that, if, in any case, the possession of a copy of a libel is evidence of a publication by the possessor, it must be a written copy of a known published libel. 1 Hawk. P. C. c. 73, § 13; 1 Vent. 31; Rex v. Fitton, 2 Keb. 502; Rex v. Beare, 2 Salk. 418, Carth. 409, and 1 Ld. Raym. 414; Want's Case, Moore, 627; 1 Russ. 235; Barrow v. Lewellin, Hob. 62; 2 Saund. Pl. & Ev. 209; Burdett's Case, 4 Barn. & Ald. 135; Starkie, 419; 12 Vin. Abr. 239.

The attorney of the United States, in reply, cited Starkie, Ev. pt. 4, pp. 849, 871, 875; 3 Chit. 875c; 1 Russ. 235; 12 Vin. Abr. tit. "Evidence," T, b, 61.

THE COURT permitted the United States to give evidence to the jury, that the defendant was found in possession of printed copies of the libel charged in the second count, and of one of those charged in the third count; of the publication of which, in this district, some evidence had been given.

The attorney for the United States then offered, in evidence, the pamphlets containing the pictures, which were charged as libellous, in the third count.

THE COURT permitted the pictures to be given in evidence, and shown to the jury, but refused to suffer the pamphlets, attached to the pictures, to be read to the jury by the attorney of the United States, as no part but the pictures was charged as libels in that count.

The attorney of the United States then offered to read to the jury the pamphlets attached to the pictures, to show the evil intent with which the pictures were published.

THE COURT said, that if the matter now proposed to be read, is not charged in the indictment, and would be, of itself, a substantive libel, and therefore indictable, it cannot be given in evidence.

The attorney for the United States offered to examine, as a witness, one John Colclazer, a colored man, born of a white woman.

The counsel for the defendant objected.

But THE COURT (THRUSTON, Circuit Judge, contra) overruled the objection, and the witness was sworn and examined.

The evidence being closed, Mr. Carlisle, who opened the argument to the jury, on behalf of the prosecution, was about to read some parts of the pamphlets containing the libellous matter charged in the indictment, which parts had not been read in the opening of the evidence.

The defendant's counsel objected to anything being read in argument, to the jury, which had not been read when the pamphlets were offered in evidence.

But THE COURT overruled the objection, and said that the United States had not only the right, but were bound, to give in evidence the whole of the publication which contains the libellous matter charged; and either party has a right to read any part of it, pertinent to the issue.

Verdict, not guilty.